UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

ZACHARY HARRIS,                            )
                                           )
                    Plaintiff,             )
                                           )
                                           )
     vs.                                   )        No. 1:09CV00141 AGF
                                           )
                                           )
MICHAEL J. ASTRUE,                         )
Commissioner of Social Security            )
Administration,                            )
                                           )
                    Defendant.             )


## MEMORANDUM AND ORDER

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Zachary Harris was not disabled

and, thus, not entitled to supplemental security income ("SSI") under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383f.  For the reasons set forth below, the

decision of the Commissioner shall be affirmed.

Plaintiff, who was born on June 27, 1989, filed for benefits on May 15, 2007, at

the age of 17, alleging a disability onset date of October 1, 2004, due to a learning

disability and behavioral problems.  After Plaintiff's application was denied at the initial

administrative level, he requested a hearing before an Administrative Law Judge ("ALJ")

and such hearing was held on March 10, 2009.  The Plaintiff, his mother, and a

vocational expert ("VE") testified at the hearing. By decision dated April 24, 2009, the

ALJ found that, as an adolescent and as an adult, Plaintiff had the residual functional

capacity ("RFC") to perform a full range of work at all exertional levels, with the non-

exertional limitations that the Plaintiff could only perform simple, repetitive one-or-two

step jobs with limited social contact. Therefore, the ALJ found that Plaintiff was not

disabled under the Act. Plaintiff's request for review by the Appeals Council of the

Social Security Administration was denied on August 15, 2009. Plaintiff has thus

exhausted all administrative remedies and the ALJ's decision stands as the final agency

action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in

the record as a whole. Specifically, Plaintiff argues that in assessing his RFC, the ALJ

failed properly to consider Plaintiff's mental retardation under the Commissioner's listing

of deemed-disabling impairments, 20 C.F.R. pt. 404, subpt. P, App. 1 ("Appendix 1"), §§

12.05C and 112.05D. Plaintiff further argues that the ALJ erred in finding that Plaintiff

has the mental RFC to perform work activity on a sustained basis. Plaintiff asks this

Court to reverse the decision and remand the case with instructions to award Plaintiff

benefits.

## BACKGROUND

### School and Medical History

Plaintiff's report cards for grades one through seven show generally poor grades.

(Tr. 145, 221-22.) Standardized testing in the first and second grade show that Plaintiff

was below the 10th percentile for reading, language arts, and mathematics. (Tr. 220.)

On May 20, 2004, Plaintiff was admitted to the hospital after making superficial cuts on his left arm with a razor blade. According to treatment notes, Plaintiff had become depressed, reportedly after hearing the day earlier that his girlfriend had sex with someone else. Plaintiff was guarded about discussing the issues, and his family noted that they were worried about his safety. Plaintiff complained of poor sleep and crying spells and reported having academic problems in school, but denied feeling hopelessness or helplessness. He also denied use of alcohol or illicit drugs, any history of suicidal attempts, having any suicidal or homicidal thoughts at that time, and having any auditory or visual hallucinations. On mental status examination, Plaintiff was diagnosed with "adjustment disorder with depressed mood," a "relationship problem," and a global assessment of functioning ("GAF") score at the time of admission of 35.[1] (Tr. 161-62.) At the time of Plaintiff's discharge on May 24, 2004, Plaintiff's GAF was 60. He was prescribed Zoloft and was instructed to follow up at a family counseling center. (Tr. 160-61.)

_____

[1] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. GAF scores of 21-30 reflect behavior that is "considerably influenced" by delusions, hallucinations, serious impairment in communication or judgment, or an inability to function in almost all areas; scores of 31-40 indicate "some" impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32-4.

On September 24, 2004, Plaintiff met with Stephen Smith, M.D., a general care physician, for a medication evaluation. Dr. Smith diagnosed depression, but noted that Plaintiff was stable. He renewed Plaintiff's prescription for Zoloft, and instructed him not to miss doses. (Tr. 258.)

On January 6, 2006, three educational professionals met with Plaintiff's mother to obtain her permission to retest Plaintiff, who was then in the tenth grade, and implement a 30 day Individual Education Program ("IEP") until testing results were complete. Notes on Plaintiff's "Present Level of Academic Achievement and Functional Performance" indicate that Plaintiff's previous IEP, which was completed on March 16, 2004, estimated that Plaintiff was at the second grade level in reading, lower third grade level in reading comprehension, and fourth grade level in mathematics. His teacher, Pam Owens, reported that Plaintiff was "interested in learning," and she asserted that she was developing a good rapport with him. (Tr. 165-66.)

Notes from the January 6, 2006 IEP meeting set out three annual goals for Plaintiff: to increase his reading and oral comprehension skills, to increase his math computation and reasoning skills, and to receive no more than the allowed unexcused tardies or absences for the duration of the school year. The notes indicated that he would receive specialized instruction in the core subjects of reading, language arts, and math, seven hours daily, beginning on January 6, 2006. He also would not be expected to participate 100% of the time with non-disabled peers in the regular education environment because he was functioning below his grade level and required significant

modification of the academic curriculum to be successful. The notes also indicate that he

needed repetition and additional assistance in his academic studies to be successful. The

attendees at the IEP meeting decided to place Plaintiff in a public separate school (day)

facility, and discussed a transition services plan to help Plaintiff increase his knowledge

in life skills. (Tr. 168-79.)

On February 25, 2007, Plaintiff was admitted to the emergency room after getting

into a physical altercation with his older brother. He was admitted for psychiatric

monitoring and evaluation. During his initial evaluation, Plaintiff admitted to regular use

of alcohol since age 12 and regular use of marijuana since age six, but denied the use of

any other substances. At the time of his admission, Plaintiff's blood alcohol level was

.163 and he tested positive for cannabis. He reported a past history of intermittently

depressed mood, which he attributed to chronic physical abuse inflicted on him by his

older brother. He also reported intermittent visual hallucinations consisting of "demons

walking on the floor," but he stated that he was not afraid of the demons because he was

accustomed to seeing them. The examining psychiatrist noted Plaintiff's limited

vocabulary and "very limited" general knowledge, and observed that Plaintiff was not

oriented to the date, and that his insight and judgment were "poor to fair." Plaintiff was

diagnosed with a "Mood disorder, not otherwise specified," alcohol and cannabis abuse,

and a current GAF of 40. (Tr. 266-68.)

At the time of discharge on February 27, 2007, Plaintiff's GAF was 65. He was

prescribed Risperdal and Trazodone, and given an intake appointment at a family

counseling center.  (Tr. 264-65.)

On March 28, 2007, Plaintiff met with Ali Abbas, M.D., a psychiatrist, on referral from the hospital.  Plaintiff complained of an "anger problem."  Plaintiff's mother, who brought him to the appointment, asserted that Plaintiff had experienced anger problems since the sixth grade and indicated that when Plaintiff got angry, he would punch holes in the wall, but she denied any significant physical aggression towards others or destruction of property.  Plaintiff's mother reported that at certain times during the month, Plaintiff would sleep more than usual, and at other times, he would not sleep for a few days but would not appear tired and would pace the house.  Dr. Abbas indicated that Plaintiff's mother denied any other symptoms that would suggest bipolar spectrum disorder.

In a separate interview, Plaintiff denied being physically assaultive to individuals or destroying property.  He did report, however, the physical altercation with his brother after which he was admitted to the hospital.  Plaintiff informed Dr. Abbas that Risperdal had helped with his anger problem to an extent, but that he would still get angry.  Dr. Abbas observed "some blunted affect," but asserted that Plaintiff's thought process was linear and goal directed, that he was alert and oriented, that his attention, concentration, and memory were grossly within normal range, and that his insight and judgment were fair.  Dr. Abbas diagnosed Plaintiff with an "Adjustment Disorder With Disturbance of Emotions and Conduct," "Borderline Intellectual Functioning With Mild Mental Retardation," "Poor Interpersonal Relationship; Conflict with Family; Academic Related Difficulties," and a GAF of 55-60.  Dr. Abbas switched Plaintiff's medication from

Risperdal to Trileptal, advised individual counseling to address Plaintiff's anger management issues, and recommended that Plaintiff return to the clinic in seven weeks. (Tr. 191-93.)

On April 25, 2007, Plaintiff and his mother attended a family therapy session with a licensed professional counselor at a family counseling center. Plaintiff complained of "anger issues." Plaintiff's mother indicated that Plaintiff's anger outbursts had steadily decreased since he started taking Trileptal, to the point where he would respond calmly to constructive criticism. Plaintiff indicated that it was "easier to handle things now." Plaintiff's mother inquired about Job Corp, and Plaintiff seemed interested in the program. The counselor's notes indicate that Plaintiff's mood and affect at this meeting were euthymic, that Plaintiff displayed symptoms of oppositional defiant disorder ("ODD"), but that he showed a marked reduction in intensity and frequency of hostile and defiant behaviors towards adults. Plaintiff was to follow up with another counselor to discuss his educational needs. (Tr. 182-88.)

On May 16, 2007, Plaintiff did not appear for a case management appointment with Dr. Abbas. (Tr. 190.) On June 21, 2007, Plaintiff met with Dr. Abbas for a medications check. Dr. Abbas noted that Plaintiff's attitude seemed defensive and that his affect was blunted. (Tr. 269.) On August 17, 2007, Plaintiff missed his appointment to meet with Dr. Abbas for a psychological evaluation. (Tr. 270.)

On August 29, 2007, Plaintiff met with state consultant Thomas J. Spencer, Psy.D., in connection with his application for disability benefits. Plaintiff's chief

complaint was that "[p]eople call me retarded." Plaintiff could not recall what medication he was prescribed, and asserted that it did little to keep him from getting irritated, but it did help keep him from reacting to things too quickly. Plaintiff reported that he did not sleep more than a few hours per night because he "cannot stop thinking." He also indicated that his appetite was "pretty good." He denied recurrent thoughts of suicide, but did admit to a sense of hopelessness. He told Dr. Spencer that he cut grass to make a little money. He indicated that he could not follow a recipe but claimed to be able to manage a checkbook.

In a mental status exam, Dr. Spencer observed that Plaintiff's motor behavior was "delayed." Dr. Spencer further observed that Plaintiff's "[i]nsight and judgment appeared limited," and that Plaintiff "presented with a restricted affect." When asked to describe his mood, Plaintiff responded that he felt "kinda down." Dr. Spencer observed that Plaintiff was "alert and oriented to person, place, 'summer,' and event," that he "did not appear to respond to any sort of internal stimuli," that he did not elicit any delusional beliefs, and that his "[f]low of thought seemed intact and relevant." (Tr. 194-95.)

Dr. Spencer administered the Wechsler Adult Intelligence Scale-III ("WAIS-III") to Plaintiff, who "appeared motivated and looked to put forth adequate efforts." Plaintiff's results indicated a Verbal IQ of 6, a Performance IQ of 65, and a Full Scale IQ of 61, placing Plaintiff in the extremely low range of intellectual functioning. Dr. Spencer observed that while no prior testing was available for review, the available records indicated the probability of "borderline intelligence/mild mental retardation." (Tr. 195).

Dr. Spencer diagnosed "[a]djustment disorder, mixed, chronic," "[o]ppositional defiant disorder (by history)," "[m]ild mental retardation," "[o]ccupational problems," and economic problems, and a GAF of 50-55. Dr. Spencer stated that Plaintiff appeared capable of understanding and remembering simple instruction and engaging in and persisting with simple tasks. He observed that Plaintiff had a moderate limitation with regard to his ability to interact socially and adapt to the environment. He concluded that Plaintiff would need assistance in managing his benefits. (Tr. 196.)

On September 20, 2007, non-examining state consultant James Spence, Ph.D, completed a Psychiatric Review Technique in checkbox format based on the "12.05 Mental Retardation" and "12.06 Anxiety-Related Disorders" categories in Appendix 1.[2]

---

[2]    Listing 12.05 of Appendix 1 defines "mental retardation" as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Listing 12.05 contains four criteria, "A," "B," "C," and "D," and the required level of severity for listing 12.05 is met if any one of the four sets of criteria is met. For A to be met, the individual must have a mental incapacity evidenced by dependence upon others for personal needs and an inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded. For B to be met, the individual must have an IQ of 59 or less. For C to be met, the individual must have an IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. For D to be met, the individual must have an IQ of 60 through 70, resulting in marked difficulty in at least two of three functional areas (daily living, social functioning, and maintaining concentration persistence, or pace), or marked difficulty in at least one of these areas plus repeated episodes of decompensation, each of extended duration.

Listing 12.06 of Appendix 1 defines "anxiety related disorders" as disorders where anxiety is the predominant disturbance or it is experienced if the individual attempts to master symptoms. Listing 12.06 contains three criteria, "A," "B," and "C," and the required level of severity for Listing 12.06 is met when A and B are met, or when A and

Under "Mental Retardation," Dr. Spence indicated "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates onset of the impairment before age 22 . . . ." Under "Anxiety-Related Disorders," Dr. Spence indicated the presence of an adjustment disorder. Under the "B" criteria of the listings, Dr. Spence noted mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. He indicated that the evidence did not establish the presence of the "C" criteria. (Tr. 198-207.)

In a Mental RFC Assessment, Dr. Spence indicated, in checkbox format, that Plaintiff was moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without

---

C are met. For A to be met, the individual must have certain medically documented findings. For B to be met, the individual must have marked difficulty in at least two of three functional areas (daily living, social functioning, and maintaining concentration persistence, or pace), or marked difficulty in at least one of these areas plus repeated episodes of decompensation, each of extended duration. For C to be met, the individual must have the complete inability to function independently outside one's home.

distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, to adhere to the basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others.

Dr. Spence noted that Plaintiff was not significantly limited in his ability to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to interact appropriately with the general public; to ask simple questions or request assistance; to be aware of normal hazards and take appropriate precautions; and to travel to unfamiliar places or use public transportation. (Tr. 209-10.)

Dr. Spence diagnosed Plaintiff with "Adjustment Disorder, mixed, chronic, ODD by history, Mild Mental Retardation," and assessed a GAF of 50-55. In the narrative form of his assessment, he asserted that Plaintiff was capable of understanding and remembering simple instructions and engaging in and persisting with simple tasks. Dr. Spence also noted that Plaintiff's ability to interact socially and adapt to his environment was moderately limited. Dr. Spence asserted that overall, Plaintiff was "capable of completing simple repetitive tasks on a sustained basis." (Tr. 211.)

Because Plaintiff attained the age of 18 during the adjudication period, Dr. Spence

completed a Childhood Disability Evaluation Form in addition to the adult forms. On the child form, Dr. Spence noted impairments of borderline intellectual functioning, an adjustment disorder, and a history of oppositional defiant disorder. In a checkbox section, Dr. Spence indicated that Plaintiff's impairment or combination of impairments was severe, but did not meet, medically equal, or functionally equal an Appendix 1 listing. In considering functional equivalence, Dr. Spence noted that Plaintiff had no limitation with regard to attending and completing tasks or moving about and manipulating objects, or with respect to his health and physical well-being; less than marked limitation with respect to interacting and relating with others and caring for himself; and a marked limitation with respect to acquiring and using information. Dr. Spence opined that Plaintiff's statements were not fully supported, but that it was apparent that Plaintiff had some limitations. (Tr. 213-17.)

On December 12, 2007, Plaintiff met with T.J. Feeler, Ed. D., a licensed professional counselor. Plaintiff complained of anger issues, and stated that he would get mad "when they speak to me." He stated that the problem started the year before, and that it occurred "sometimes." Dr. Feeler diagnosed Plaintiff with dysthymia disorder. (Tr. 271-73.) On January 16, 2008, Plaintiff failed to keep his appointment with Dr. Feeler and did not call or reschedule. (Tr. 283.)

On February 25, 2008, Plaintiff met with Ferdinand Armas, M.D., for a medications check. Plaintiff indicated that he was not doing well, stating that, "My anger is still building up." He told Dr. Armas that he did not feel that his medications were

helping him.  Dr. Armas noted that Plaintiff's grooming was fair, his psychomotor skills and thoughts were within normal limits, and his mood was irritable.  Plaintiff denied any suicidal or homicidal intent, and indicated that it had been some time since his last visual hallucination.  Dr. Armas switched Plaintiff from Risperdal to Invega to reduce his irritability and anger, and to stop his hallucinations.  (Tr. 284.)

On April 8, 2008, Plaintiff again met with Dr. Armas for a medications check. Plaintiff indicated that he was doing better, and that he was experiencing fewer anger outbursts.  Dr. Armas noted that Plaintiff's grooming was fair, and his psychomotor skills, thoughts, speech, and attention were within normal limits.  Dr. Armas noted that, with regard to mood, Plaintiff experienced good and bad days.  His notes further indicated that Plaintiff did not express any suicidal or homicidal intent, or report any hallucinations.  Noting that Plaintiff did not have any side effects to the medicine, Dr. Armas continued Plaintiff's Invega prescription.  (Tr. 285.)

**Evidentiary Hearing of March 10, 2009 (Tr. 29-67)**

Plaintiff, who was represented by counsel, testified that he left school in the tenth grade because the teachers were not helping him with his work, and he later attempted to attend an alternative school, but left after approximately one week.  He explained that he was unable to spell the passwords required to get into the system to complete his assignments.  Plaintiff further testified that his mother attempted to get him through a GED program, but he was unable to complete the program because he was arrested for breaking into someone's house.  The case was still pending, and he had an upcoming

13

court date.

Plaintiff testified that in his nine years of schooling, he never learned to read or write. When he sought help from his teachers, they pushed him aside. This would make him angry, and he would not want to do anything further. Plaintiff attributed his low attendance rate to being frequently kicked out of school.

Plaintiff testified that he did not work after he left school, but he could not explain why. He stated that he instead spent most of his time playing with his dog and visiting his cousin and grandmother. He no longer saw the doctor at a family counseling center because the center was supposed to arrange for a new doctor but never did so. He no longer took any medications.

Plaintiff testified that he lived with his mother and sister. He helped with chores around the house, including cleaning his room and doing yard work. He could cook certain foods because he watched his mother and uncle do so, but he could not prepare pre-packaged foods because he could not read the instructions on the boxes. He could look at the numbers to adjust the dials on the stove, but was unable to perform basic mathematical operations. Plaintiff would not go to the store alone to make purchases; instead, he would typically be accompanied by his sister or 16-year-old cousin. If Plaintiff were to make a purchase, he would not count the change and would instead trust the clerk to give him the appropriate amount. Plaintiff asserted that he did not receive an allowance.

Plaintiff testified that he did not drive. He once took the written part of the

driver's test after studying the book for approximately one week. Someone read the test to him and transcribed his responses, but he failed the test because he missed one too many answers. He did not retake the test because he got mad when he failed the first time.

Plaintiff testified that he avoided people, preferring simply to walk away because he feared people would tease him for being unable to read or write. He similarly did not get along with people in stores, avoiding eye contact or communication. Plaintiff testified that his three-year-old daughter lived with her mother, but would sometimes stay overnight with Plaintiff in his house, and he would spend time with her, walking and riding bikes, and cook for her, typically heating up noodles.

In response to questions from the ALJ regarding drugs and alcohol, Plaintiff testified that in February 2007, when Plaintiff was taken to the hospital and found to have marijuana and alcohol in his system, he had been at a party where other partygoers "forced" him to drink by teasing him, but that was the only time he ever did this. The only time he got into trouble with marijuana was about nine months ago, when his daughter's mother needed money, so Plaintiff attempted to help by selling drugs.

Plaintiff stated that he had no friends, and that he would go places by himself. To pass the time, he would get his girlfriend and they would walk to the park or watch a movie at his house. He did not participate in activities outside and away from the home, such as attending church or going to group or club meetings, but would visit his grandmother at her house, where they would watch soap operas and he would help with

chores around her house. To earn money, he picked up scrap metal along the railroad tracks to sell at the junkyard.

Plaintiff testified that during the periods of depression noted in his medical records, he would sleep to pass the time. He would not feel like interacting with people , and would sit by himself. He would experience mood swings during which he would not feel like interacting with others. Plaintiff testified that he would go through such a period "very blue moon," but could not clarify what he meant by the term. He stated that he had not experienced a period of depression for the past few weeks, and that medications prescribed by his doctors were ineffective.

Plaintiff's mother also testified at the hearing. She testified that Plaintiff missed classes in grade school as a result of frequent headaches and physical illness, but doctors were never able to find anything physically wrong with him. In junior high and high school, he had problems receiving help from the teachers. Plaintiff left school after the tenth grade because the school kept him in an in-school suspension program all the time for not paying attention or not completing his work. She asserted that to her knowledge, Plaintiff could not read a first-grade level book without assistance.

Plaintiff's mother testified that Plaintiff sometimes handled money by himself, but relied on store clerks to give him the correct change. She testified that she gave him an allowance that he managed on his own, and that he was able to go to the store and perform other chores. Plaintiff had taken the driver's test several times, but was unable to pass. Plaintiff's mother attempted to go through the book with him, but he could not sit

still long enough for her to read through the whole book.  While she was reading through the book and asking him questions, he would just get up and do other things.

Plaintiff's mother testified that Plaintiff stopped going to the family counseling center in 2008 because the center told Plaintiff that he was grown and able to make his own choices.  He stopped taking his medication because he did not feel that it was helping him.

Plaintiff's mother asserted that Plaintiff did not help much around the house.  He would do chores like vacuuming, cleaning the living room, and laundry, but he had difficulty completing these tasks.  She did not believe that, if given the money, Plaintiff would be able to get his own apartment and live independently.  She believed that he might have had a problem in the past with alcohol, but did not know whether he currently drank.

Plaintiff's mother did not work, and Plaintiff essentially stayed home all day.  Sometimes Plaintiff watched TV with his girlfriend or went walking to visit his cousin or brother in the afternoon.  He spent time with his daughter, and if instructed that his daughter needed to eat, would fix her food.  Plaintiff's mother testified that Plaintiff preferred familiar things, and would choose to stay home rather than accompany her on shopping trips around town.

The Court asked the VE to consider an individual of Plaintiff's age, education, and work experience, who was limited to simple, repetitive work that required only limited social contact and did not require the ability to handle money, drive a motor vehicle, use

mathematical skills, or read.  The VE testified that such a person could perform jobs such as lawn worker, plant nursery worker, laundry worker, and housekeeper or cleaner, and that these jobs existed in significant numbers in the state of Missouri.

The VE testified that such an individual, who also required one-on-one attention to maintain focus and attention to the task and persistence for task completion, could not perform any of the jobs listed in the first hypothetical.

Plaintiff then testified that he previously tried mowing lawns, but it did not work out because when he asked potential customers if he could mow their lawns, they would indicate that they did not need his services at that point, and when they later requested his services, he was no longer performing lawn work.

**ALJ's Decision of April 24, 2009 (Tr. 7-28)**

The ALJ first assessed the Plaintiff as an adolescent, as Plaintiff had not yet attained age 18 on the date the application was filed; the ALJ then assessed Plaintiff as an adult, as Plaintiff had attained age 18 by the date of the decision.  As to the assessment of Plaintiff as an adolescent, the ALJ found that Plaintiff had the severe impairment of borderline intellectual functioning/mild mental retardation; however, his impairment did not meet or medically equal one of the deemed-disabling impairments listed in Appendix 1.  The ALJ specifically considered listing 112.05[3] (mental retardation in adolescents),

---

[3]     Listing 112.05 of Appendix 1 defines "mental retardation" as disorders "characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning."  Listing 112.05 contains five criteria, "A" "B," "C," "D," and "E" and the required level of severity for listing 112.05 is met if any one of the five sets of

and found that (1) Plaintiff did not have an inability to follow directions such that use of

standardized measures of intellectual functioning was precluded; (2) Plaintiff did not

have an IQ score of 59 or less; (3) while Plaintiff had marked impairment in

cognitive/communicative function, he had no other marked impairments in the criteria

listed under paragraph B2 of 112.02; and (4) besides his IQ of 69-70, Plaintiff did not

have a physical or other mental impairment imposing an additional and significant

limitation of function. Because Plaintiff did not satisfy any of the subsections of listing

112.02, the ALJ held that Plaintiff did not meet the listing prior to attainment of age 18.

The ALJ next considered whether Plaintiff's mental impairment as an adolescent

functionally equalled a listed impairment, by evaluating Plaintiff's limitations in the

relevant six domains of functioning. The ALJ found that Plaintiff had a marked

limitation in acquiring and using information; a less than marked limitation in attending

------------------------------

criteria is met. For A to be met in adolescents, the individual must have an impairment
resulting in at least two appropriate age-group criteria in paragraph B2 of 112.02. For B
to be met, the individual must have a mental incapacity evidenced by dependence upon
others for personal needs (grossly in excess of age-appropriate dependence) and an
inability to follow directions, such that the use of standardized measures of intellectual
functioning is precluded. For C to be met, the individual must have an IQ of 59 or less.
For D to be met, the individual must have an IQ of 60 through 70 and a physical or other
mental impairment imposing an additional and significant work-related limitation of
function. For E to be met, the individual must have an IQ of 60 through 70, resulting in
marked difficulty in at least two of three functional areas (daily living, social functioning,
and maintaining concentration persistence, or pace), or marked difficulty in at least one of
these areas plus repeated episodes of decompensation, each of extended duration. For F
to be met in adolescents, the individual must have an impairment that results in the
satisfaction of listing 112.02B2a, and a physical or other mental impairment imposing an
additional and significant work-related limitation of function.

and completing tasks and in interacting and relating with others; and no limitation in moving about and manipulating objects, in ability to care for himself, or in health and physical well-being.  Therefore, the ALJ found that, before attaining age 18, Plaintiff did not have an impairment, or combination of impairments, that resulted in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning, and was therefore not disabled prior to attaining age 18.  The ALJ also found that Plaintiff had not developed any new severe impairments since attaining age 18.

The ALJ found that Plaintiff continued to have a severe impairment of borderline intellectual functioning/mild mental retardation since attaining age 18, but that the impairment did not meet or medically equal one of the listed deemed-disabling impairments.  The ALJ specifically considered listing 12.05 and found that Plaintiff did not have (1) dependence on others for personal needs, (2) a valid IQ score of 59 or below, (3) a valid IQ score of 61-70 with a physical or other mental impairment imposing an additional and significant work-related limitation of function, or (4) a valid IQ score of 61-70 in combination with two of any of the four criteria listed in 12.05(D).  Thus, the ALJ found that Plaintiff did not meet one of the four subsections of the listing.

The ALJ concluded that Plaintiff, since attaining age 18, had the RFC to perform a full range of work at all exertional levels, but with the nonexertional limitations of simple, repetitive one or two-step jobs with limited social contact.  In making this finding, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible, as the allegations in excess of

20

Plaintiff's RFC were not supported by medical evidence. The ALJ noted that Plaintiff was taking no medication and receiving no medical treatment at the time of the hearing.

Further, the ALJ explained that he gave the opinions of Dr. Spence great weight because he was a specialist in psychology, familiar with Social Security disability programs, and his opinions did not conflict with other substantial evidence of record and were explained in sufficient detail to identify the bases for them. The ALJ thus agreed with Dr. Spence that Plaintiff retained the capability to perform simple, repetitive tasks on a sustained basis.

The ALJ concluded that Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy, based upon the VE's testimony that Plaintiff could perform the jobs of lawn pruner, which translated in the Dictionary of Occupational Titles ("DOT") to the jobs of vine pruner and flower picker, and the jobs of laundry worker and housekeeper/cleaner, which translated in the DOT to the job of ironer, all of which were available in significant numbers in the local and national economy.

Accordingly, the ALJ held that Plaintiff was not disabled, as defined in the Social Security Act, prior to June 26, 2007, the date he attained age 18; further, that Plaintiff was not disabled, as defined in the Social Security Act, since May 15, 2007, the date the application was filed.

# **DISCUSSION**

## **Standard of Review**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." Id. (citation omitted); see also Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009).

## **The Determination of Disability**

Social security disability benefits are designed for disabled workers, but low-income parents may obtain SSI benefits on behalf of their disabled children as well. 42 U.S.C. § 1382c(a)(3)(C)(I). In order to be entitled to such benefits, a child under the age of 18 must show that he or she has a medically determinable physical or mental impairment resulting in "marked and severe functional limitations," which can be expected to result in death or which have lasted or can be expected to last for a

continuous period of not less than 12 months.  Id.

The Commissioner's regulations set out a three-step sequential evaluation process to determine whether a child's impairment (or combination of impairments) results in marked and severe functional limitations.  The Commissioner begins by deciding whether the child is engaged in substantial gainful activity.  If so, benefits are denied.  20 C.F.R. § 416.924(a)-(b). If not, at step two, the child's impairment is evaluated to determine whether it is severe.  The impairment is not severe if it is only a slight abnormality or combination of slight abnormalities that causes no more than minimal functional limitations.  20 C.F.R. § 416.924(c).  If the child's impairment is not severe, there is no disability. If the impairment is severe, at step three the ALJ compares the impairment to the childhood listings in Appendix 1.  If the child's impairment meets, medically equals, or functionally equals a listed impairment, the child is disabled.  20 C.F.R. § 416.924(d).

If a child's impairment or combination of impairments does not meet or medically equal a listed impairment, the Commissioner is to assess all the functional limitations caused by the child's impairment or combination of impairments.  20 C.F.R. § 416.926a(a).  If the functional limitations caused by the child's impairment are the same as the disabling functional limitations cause by a listed impairment, the Commissioner is to find that the child's impairment or combination of impairments is functionally equivalent in severity to a listed impairment.  In determining functional equivalence, the Commissioner considers the child's functioning in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others,

(4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  In order to functionally equal a listed impairment, the child must have a "marked" limitation in two domains or an "extreme" limitation in one domain.  Id.; Hudson ex. rel Jones v. Barnhart, 345 F.3d 661, 665 (8th Cir. 2003); Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 80-85 (2d Cir. 2003).  A marked limitation is one that "interferes seriously" with the child's ability to independently initiate, sustain, or complete domain-related activities; an extreme limitation is one that "interferes very seriously" with these abilities.  20 C.F.R. § 416.926a(e)(2), (3).  Not every activity in a domain must be markedly or extremely limited in order for the child's functioning in the domain as a whole to be considered so. Id.

**The ALJ Properly Analyzed Plaintiff's Impairment Pursuant to the Listed Impairments.**

Plaintiff argues that a finding of disabled should have been made under listing 112.05D and 12.05C due to Plaintiff's full scale IQ of 61, combined with his diagnosis of Dysthymia, Adjustment Disorder with Depressed Mood and Oppositional Defiant Disorder.  To meet listing 112.05D, a claimant must show (1) a valid verbal, performance, or full scale IQ score of 60 through 70, and (2) an additional and significant limitation of function.  To meet listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70, (2) an onset of the impairment before age 22, and (3) an additional physical or other mental impairment imposing an additional and

significant work-related limitation of function.

In considering Plaintiff's alleged disability, the ALJ considered listings 112.05D and 12.05C, and found that, while Plaintiff had a valid IQ score of 61-70, he did not have a physical or other mental impairment imposing an additional and significant work-related limitation of function. (Tr. 16-17, 23-27.) The ALJ found that because Plaintiff had no severe impairments other than borderline intellectual functioning/mild mental retardation, he did not have a physical or mental impairment imposing an additional and significant work-related limitation of function under listings 112.05D and 12.05C. (Tr. 17, 24.)

The Court finds that there is substantial evidence in the record to support the ALJ's determination that Plaintiff's diagnosis of Dysthymia, Adjustment Disorder with Depressed Mood and Oppositional Defiant Disorder did not create a mental impairment imposing an additional and significant work-related limitation of function under listings 112.05D and 12.05C. Plaintiff's treatment notes reflect ongoing improvement in Plaintiff's behavior from March 2007 to April 2007. (Tr. 182, 192, 196, 269, 271.) April 2007 treatment notes indicate that Plaintiff's anger outbursts were "steadily decreasing," and that he was responding calmly to constructive criticism. The April 2007 notes also indicate that medication was helping Plaintiff. (Tr. 182.) The August 2007 treatment notes of Dr. Spencer indicate that Plaintiff had a full scale IQ score of 61, and Dr. Spencer opined that Plaintiff appeared to be capable of understanding and remembering simple instructions and engaging in and persisting with simple tasks. (Tr. 196.) By

December 2007, Plaintiff was reporting no health issues. His only diagnosis was dysthmia disorder, and his GAF was estimated at 65, indicating only mild symptoms. (Tr. 271.) Over the next few months, his dysthmia disorder was also controlled by medication. (Tr. 284-85.)

Therefore, the Court finds that the ALJ properly analyzed Plaintiff's impairments pursuant to the Listed impairments.

**The ALJ's Mental Residual Functional Capacity Finding Was Proper.**

Plaintiff next argues that the ALJ's mental RFC finding was improper because "the evidence clearly demonstrates that the plaintiff does not have the mental residual functional capacity to perform work activity on a sustained basis, at a substantial and gainful level." Plaintiff points to his limitations in functioning, outlined in his school records and psychological assessments, which he alleges document deficits resulting from his low intellectual functioning, as well as a mood disorder, which Plaintiff alleges would prevent him from engaging in work on a sustained basis. He argues that the record clearly demonstrates that Plaintiff would have difficulty performing any type of work activity because of his inability to perform in a stable and predictable manner in the work setting.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful

conditions in which real people work in the real world." Id. at 1147. The ALJ's

determination of an individual's RFC should be "based on all the evidence in the record,

including 'the medical records, observations of treating physicians and others, and an

individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019,

1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation

process, where the burden of proof rests on the claimant, the ALJ bears the primary

responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all

relevant evidence, but it "remains a medical question" and "'some medical evidence must

support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v.

Massanari, 259 F.3d 7, 711 (8th Cir. 2001). The ALJ is therefore required to consider at

least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d

700, 704 (8th Cir. 2001).

The ALJ's opinion in this case was supported by medical evidence from Drs.

Spencer and Spence. (Tr. 194-96, 209-17.) The record indicates that Dr. Spencer

examined Plaintiff on August 29, 2007, for a disability determination. (Tr. 194-96.) Dr.

Spencer administered the WAIS-III to Plaintiff, whose results indicated a Verbal IQ of

63, a Performance IQ of 65, and a Full Scale IQ of 61. Following his examination of

Plaintiff, Dr. Spencer stated that Plaintiff "appeared capable of understanding and

remembering simple instructions," and "appeared capable of engaging in and persisting

with simple tasks." He observed that Plaintiff had a "moderate limitation with regard to

his ability to interact socially and adapt to the environment." (Tr. 196.) As Plaintiff's examining psychologist, Dr. Spencer's opinion receives substantial weight. See Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir.1992).

Dr. Spence completed a Psychiatric Review Technique Form and Mental RFC Assessment on Plaintiff and found that Plaintiff had no marked or worse limitations. He also asserted that Plaintiff was "capable of understanding and remembering simple instructions" and was "capable of engaging in and persisting [sic] with simple tasks." Dr. Spence asserted that overall, Plaintiff was "capable of completing simple repetitive tasks on a sustained basis." (Tr. 211.)

The ALJ notes that he gave the opinion of Dr. Spence great weight because he was a specialist in psychology, his opinions did not conflict with the other evidence in the record, his opinions were consistent with those of Dr. Spencer, he explained his opinions in sufficient detail to identify the basis for them, and he had most of the available records before him when formulating his opinions. This was consistent with the regulations. 20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2) state that the ALJ should consider RFC assessment forms, completed by medical consultants, at the hearing level. Moreover, more weight is generally given to the opinion of a specialist about medical issues related to his area of specialty. 20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5).

The ALJ also considered the testimony of the VE. In response to a hypothetical question which reflected Plaintiff's RFC, the VE testified that the hypothetical individual could perform work existing in significant numbers in the national economy, such as

lawn worker, nursery worker, and laundry worker. (Tr. 64.) The Court finds that the hypothetical question posed to the VE was proper because it accurately reflected the combination of Plaintiff's impairments as reflected by substantial evidence in the record and accepted as true by the ALJ. See Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (a hypothetical question is properly formulated if it sets forth impairments "supported by substantial evidence in the record and accepted as true by the ALJ") (citing Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Because the question was properly formulated, the VE's testimony that Plaintiff could perform work existing in significant numbers in the local and national economy, constitutes substantial evidence to support the ALJ's determination. See Miller v. Shalala, 8 F.3d 611, 613-14 (8th Cir. 1993); Andres v. Bowen, 870 F.2d 453, 455-56 (8th Cir. 1989).

The Court finds that the ALJ's determination of Plaintiff's mental RFC was based on substantial evidence in the record, including medical evidence. The Court, therefore, finds that the ALJ's determination of Plaintiff's mental RFC was proper.

## CONCLUSION

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citation omitted). "'If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioners's

29

findings, [the court] must affirm the denial of benefits.'" Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the Court believes that the ALJ's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED.**

A separate Judgment shall accompany this Memorandum and Order.


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 31st day of March, 2011.